FILED

2016 APR -4  AM 8: 12

CLERK, US DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY   TH   DEPUTY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JELANI AKEEM BIGSBY,<br><br>                              Plaintiff,<br><br>v.<br><br>JOE A. LIZARRAGA, Warden,<br><br>                              Defendant. | Case No.:  15-cv-1452 BEN (KSC)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE: DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

On July 1, 2015, Jelani Akeem Bigsby ("Petitioner"), a state prisoner proceeding *pro se* and *in forma pauperis*, filed a Petition for Writ of Habeas Corpus ("Petition") pursuant to 28 U.S.C. § 2254. [Doc. No. 1.] In the original writ filed with this Court, petitioner raised the following grounds for relief: (1) insufficiency of the evidence to sustain the robbery conviction concerning victims Jacqueline Ibanez and Eva Gomez; (2) impermissibly suggestive identification procedures; (3) ineffective assistance of trial counsel; and, (4) prosecutorial misconduct regarding statements made during closing arguments. *Id.* at p. 11.

This Report and Recommendation is submitted to United States District Judge Roger T. Benitez pursuant to Title 28, United States Code, Section 636(b), and Civil Local Rules 72.1(d) and HC.2 of the United States District Court for the Southern District of California.

1  Based on the moving and opposing papers, and for the reasons outlined below, this Court
2  **RECOMMENDS** that the Petition be **DENIED**.

## I. <u>PROCEDURAL HISTORY</u>

4        Petitioner Jelani Akeem Bigsby is in the custody of respondent based upon a valid
5  judgment entered in San Diego County, where a jury convicted him on August 25, 2011.
6  [Doc. No. 1, at p. 1.] Petitioner was tried jointly with co-defendant, Oscar Alfredo Ortega,
7  and both men were convicted of four counts of first degree robbery (Cal. Penal Code § 211;
8  counts 1, 2, 3, and 4); one count of burglary (Cal. Penal Code § 459; count 5); and, four
9  counts of assault with a semi-automatic firearm, (Cal. Penal Code § 245(d). [Doc. No. 11-
10 12, at pp. 223-232.] The jury additionally found that petitioner used a firearm in the
11 commission of the crime (Cal. Penal Code § 12022.53(b)). *Id.* at 228. The jury acquitted
12 petitioner and Ortega of attempted kidnapping (Cal. Penal Code § 207(a); 664). *Id.* at pp.
13 226; 230.

14        Petitioner filed a direct appeal to the California Court of Appeal, Fourth Appellate
15 District, on June 28, 2012. [Doc No. 11-18.] On appeal, petitioner argued, that the evidence
16 did not support his conviction on two of the robbery counts. *Id.* In an unpublished, 8-page
17 written opinion filed on Mary 31, 2013, the California Court of Appeal rejected petitioner's
18 claim and affirmed the judgment. [Doc. No. 11-23.]. The California Supreme Court
19 summarily denied the petitioner's appeal on August 14, 2013. [Doc. No. 11-26.]

20        On June 17, 2014 petitioner sought collateral review by the San Diego County
21 Superior Court, asserting the following five grounds for relief: (1) an unconstitutionally
22 suggestive line-up and in-court identifications prejudiced him; (2) ineffective assistance of
23 trial counsel; (3) prosecutorial misconduct resulting from improper remarks during closing
24 argument; (4) cumulative error, and; (5) ineffective assistance of appellate counsel for
25 failing to raise the above-named issues on direct appeal. [Doc. No. 11-27.] In a 7-page
26 written opinion filed on September 3, 2014, the Superior Court denied his petition. [Doc.
27 No. 11-28.]

28 ///

On September 8, 2014, petitioner filed a writ of habeas corpus to the California Court of Appeal, Fourth Appellate District, seeking collateral review. [Doc. No. 11-29.] In a 2-page written opinion filed on October 15, 2014, the Court denied the writ. [Doc. No. 11-30.] Petitioner next sought collateral review of the same issues by filing his petition with the California Supreme Court on October 27, 2014. [Doc. No. 11-31.] The California Supreme Court summarily denied petitioners writ of habeas corpus on March 18, 2015. The instant federal petition for writ of habeas corpus was timely filed in this Court on July 1, 2015. [Doc. No. 1.]

## II. STATEMENT OF FACTS

The Court of Appeal's unpublished opinion from petitioner's direct appeal, sets forth a factual background summarizing the evidence adduced at trial. [Doc. No. 11-23, pp. 2-3.] Title 28 U.S.C. § 2254(e)(1) creates a statutory presumption that the state court's findings of facts were correct, and the petitioner bears the burden of disproving these facts by clear and convincing evidence. *Tilcock v. Budge*, 538 F.3d 1138, 1141 (9th Cir. 2008). This Court has conducted an independent review of the trial record and confirmed that the Court of Appeal's factual findings comport with the record. The Court of Appeal found:

> Marco Ibanez, his wife, Elva Ibanez, their 18-year-old daughter, Jacqueline Ibanez, and her 19-year-old friend, Eva Gomez, lived in a home located in San Diego [....] On the afternoon of September 4, the home was burglarized. The burglar stole Jacqueline's and Eva's laptop computers; an envelope of money that Elva kept inside a drawer and attempted to pry open a floor safe.
>
> The following morning, defendants entered the home while a cohort waited outside in a vehicle. Defendants, armed with semiautomatic handguns, confronted Marco and threatened to kill him if he did not give them the money from his safe. Marco put the cash from the safe into Ortega's backpack. Ortega then had Marco give him the money hidden in dresser drawers. Defendants stole about $25,000 in cash from the safe and dresser drawers.
>
> In the meantime, Elva ran into the nearby bedroom shared by Jacqueline and Eva, locked the door and told them to call 911. Eva hid in the closet and called 911 from her cellular phone. Jacqueline also called 911. Bigsby broke into the room while Jacqueline was on the phone, pointed his

gun at her saying, "You better not be calling the cops." Bigsby motioned with his gun for Jacqueline and Elva to kneel on the floor.

At one point, Jacqueline heard Marco struggling to open the safe, so she told Bigsby that she could open the safe. When Bigsby asked Jacqueline if she could guarantee that she would be able to open the safe, her mind went blank. Eventually, Eva came out of the closet and Bigsby had her sit next to the other women as he pointed his gun at all of them. Bigsby grabbed Jacqueline's phone, Eva's phone, and another phone that was on a shelf and threw them to the floor, breaking them. When the police arrived defendants escaped by jumping out a window. [Doc. No. 11-23, at pp. 2-.]

Petitioner was arrested on November 10, 2010. [Doc. No. 1. At 238.] On the day that petitioner was arrested, he was identified by Jacqueline in a live line-up. [Doc. No. 1 at 41.] She believed that he may have been manipulating his voice to make it sound higher than it actually was. *Id.* DNA testing was also performed on one of the guns and one of the beanies recovered by police. *Id.* at 51. Of the two samples taken from the gun, petitioner was excluded as a potential contributor to one and the results on the other were inconclusive. *Id.* at 52. Petitioner was a possible minor contributor to the sample on the beanie. *Id.*

## III.  STANDARD OF REVIEW

Federal habeas corpus relief is available only to those who are in custody in violation of the Constitution or laws of the United States. 28 U.S.C. § 2254(a). "A federal court may not issue the writ on the basis of a perceived error of state law." *Pulley v. Harris*, 465 U.S. 37, 41 (1984). "[A] mere error of state law is not a denial of due process." *Engle v. Isaac*, 456 U.S. 107, 121 n.21 (1982) (internal quotations omitted).

This petition is governed by the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA imposes a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (internal citations and quotations omitted). Under AEDPA, a habeas petition "on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court

proceedings unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)&(2). For purposes of § 2254(d)(1), "clearly established Federal law" means "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Therefore, a lack of controlling Supreme Court precedent can preclude habeas corpus relief. *Wright v. Van Patten*, 552 U.S. 120, 126 (2008).

The AEDPA standard is highly deferential and "difficult to meet." *Harrington v. Richter*, 562 U.S. 86, 100 (2011). For mixed questions of fact and law, federal habeas relief may be granted under the "contrary to" clause of section 2254 if the state court applied a rule different from the governing law set forth in Supreme Court cases, or if it decided a case differently than the Supreme Court on a set of materially indistinguishable facts. *Bell v. Cone*, 535 U.S. 685, 694 (2002). The focus of inquiry under the "contrary to" clause is "whether the state court's application of clearly established federal law is objectively unreasonable." *Id.* "[A]n unreasonable application is different from an incorrect one." *Id.* In other words, federal habeas relief cannot be granted simply because a reviewing court concludes based on its own independent judgment that the state court decision is erroneous or incorrect. *Id.* Habeas relief is only available under § 2254(d)(1) "where there is no possibility fairminded jurists could disagree that the state court's decision conflicts" with Supreme Court precedents. *Harrington*, 562 U.S. at 101.

Where there is no reasoned decision from the state's highest court, a federal court "looks through" to the "last reasoned state-court opinion" and presumes it provides the basis for the higher court's denial of a claim or claims. *Ylst v. Nunnemaker*, 501 U.S. 797, 805-806 (1991). If the state court does not provide a reason for its decision, the federal court must conduct an independent review of the record to determine whether the state

court's decision is objectively unreasonable. *Crittenden v. Ayers*, 624 F.3d 943, 947 (9th Cir. 2010). To be objectively reasonable, a state court's decision need not specifically cite Supreme Court precedent. "[S]o long as neither the reasoning nor the result of the state-court decision contradicts [Supreme Court precedent]," the state court's decision will not be "contrary to clearly established Federal law." *Early v. Packer*, 537 U.S. 3, 8 (2002).

Here, the California Supreme Court denied the petition without comment on both the direct appeal and his habeas petition. Therefore the California Court of Appeal's written opinion of May 31, 2013 constitutes the "last reasoned state-court opinion" in the record as to Ground 1, for relief and the California Court of Appeal's October 15, 2014 opinion constitutes the "last reasoned state-court opinion" in the record as to Ground 2, 3, and 4. This Court will look to the Court of Appeal's decisions when evaluating each of the petitioner's claims under AEDPA's standards.

## IV.  **PETITIONER'S CLAIMS ARE EXHAUSTED**

As a preliminary matter, this Court must determine whether the petitioner's constitutional claims have been exhausted in the state court. Prisoners in state custody who seek a writ of habeas corpus from a federal court must first exhaust state judicial remedies before they can be granted relief. 28 U.S.C. § 2254(b)(A). Specifically, they must present the state's highest court with a fair opportunity to rule on the merits of all claims they assert in federal court. They may do so either through direct appeal or state collateral attack. *See* 28 U.S.C. § 2254(b),(c); *Granberry v. Greer*, 481 U.S. 129, 133-134 (1987). As applied to this case, it is undisputed that petitioner exhausted his state court remedies as to each claim.

## V.  **GROUND ONE: INSUFFICIENT EVIDENCE**

Petitioner asserts that insufficient evidence was presented to sustain his robbery convictions with regard to Jacqueline Ibanez and Eva Gomez. Specifically, he contends that the convictions rest on constitutionally insufficient evidence that each of the two women had possession of the stolen items seized during the course of the robbery.

To convict a defendant in a criminal proceeding requires proof beyond a reasonable doubt as to each and every element of a crime. *In re Winship*, 397 U.S. 358, 361 (1970). If

a "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" then the conviction cannot be vacated for want of further evidence. *Jackson v. Virginia*, 443 U.S. 307, 317 (1979). Once a jury determines that an individual is guilty, the court must decide "whether that finding was so insupportable as to fall below the threshold of bare rationality." The court should not ask whether it believes there was sufficient evidence to convict the defendant, but whether "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319. The court must view the facts in the light most favorable to the prosecution in order to avoid usurping the role of the jury. *Id.* Accordingly, the jury's finding of guilt is to be given deference when determining whether sufficient evidence has been presented. *Id.*

Procedurally, when a federal court evaluates a habeas petitioner's claim of insufficient evidence, "[t]he *Jackson* standard 'must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law.'" *Chein v. Shumsky,* 373 F.3d 978, 982-982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 324 n.16). Therefore, this Court must undertake two distinct steps in its analysis of the petitioner's claim. First, this Court must look to California law to determine the elements of his crime of conviction. Second, this Court must conduct an independent review of the trial record to assess whether the Court of Appeal was objectively unreasonable when it concluded that there was sufficient evidence to sustain the conviction. *Juan H. v. Allen*, 408 F.3d 1262, 1278 n.14 (9th Cir. 2005).

A petitioner who challenges a state court conviction on the grounds of federal due process and insufficient evidence "faces a heavy burden." *Juan H.*, 408 F.3d at 1274. The interplay between *Jackson* and the AEDPA creates a doubly deferential standard of review. Specifically:

> [W]hen we assess a sufficiency of evidence challenge in the case of a state prisoner seeking federal habeas corpus relief subject to the strictures of AEDPA, there is a double dose of deference that can rarely be surmounted. The *Jackson v. Virginia* standard is itself deferential, as it only permits relief

when "no rational trier of fact" could have found the elements necessary for guilt satisfied beyond a reasonable doubt. *Jackson*, 443 U.S. at 324. AEDPA adds a second layer of deference, as it is not enough if we conclude that we would have found the evidence sufficient or that we think the state court made a mistake. Rather, the state court's application of the Jackson standard must be "objectively unreasonable" to warrant federal habeas relief for a state prisoner. *Boyer v. Bellequ*, 659 F.3d 957, 964-965 (9th Cir. 2011).

As directed by *Juan H.* and *Boyer*, this Court begins its sufficiency review by determining the elements of the petitioner's crime of conviction under California law. At the outset, California law defines robbery as the "felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." Cal. Penal Code § 211 (West 2016). "It has been settled law for nearly a century that an essential element of the crime of robbery is that property be taken from the possession of the victim." *People v. Scott*, 45 Cal. 4th 743, 750 (2009) (*citing People v. Nguyen*, 24 Cal. 4th 756, 762 (2000)). Either actual or constructive possession of the property in question is sufficient to satisfy this requirement. *People v. Ugalino*, 174 Cal. App 4th 1060, 1064-1065 (2009). Because robbery is a crime against the person, an individual has constructive possession of a piece of property if he or she has "some type of 'special relationship' with the owner of the property sufficient to demonstrate that the victim had authority or responsibility to protect the stolen property on behalf of the owner." *People v. Weddles*, 184 Cal. App 4th 1365, 1369 (2010) (*citing Scott*, 45 Cal. 4th at 753). "Constructive possession does not require an absolute right of possession. 'For the purposes of robbery, it is enough that the person presently has some loose custody over the property, is currently exercising dominion over it, or at least may be said to represent or stand in the shoes of the true owner.'" *People v. DeFrance*, 167 Cal. App. 4th 486, 497 (2008) (*quoting People v. Hamilton*, 40 Cal. App. 1137, 1143 (1995)). It is possible for multiple individuals to have constructive possession of the same piece of property. *Scott*, 45 Cal. 4th at 750.

A familial bond often creates the kind of special relationship that gives rise to constructive possession. In *People v. Gordon*, 136 Cal. App. 3d. 519, 529 (1982), the

8

1   California Court of Appeal upheld both of the defendant's robbery convictions where he
2   used force to steal marijuana belonging to the victim's son who resided with them. The
3   court reasoned that if individuals such as janitors, store clerks, and bar maids were
4   responsible for protecting the property entrusted to them, then surely parents had the
5   obligation to protect the property of their adult son who lived with them. *Id.* In *Weddles*,
6   the court confirmed that a special relationship existed between the owner of the safe and
7   his brother, who was the victim of the robbery. *Weddles*, 184 Cal. App. 4th at 1370. The
8   court explained that the victim's close familial relationship to the owner of the property,
9   the frequency with which the victim visited the owner's apartment, and the fact that the
10  victim knew where the property was hidden established constructive possession of the
11  property. *Id.* Petitioner only attacks the "possession" element of his robbery convictions in
12  his habeas petition. [Doc. No. 1, at p. 14.]

13   **1. Constructive Possession by Jacqueline Ibanez**

14          The California Court of Appeal concluded that Jacqueline Ibanez had the requisite
15  "special relationship" with her farther Marco Ibanez such that a reasonable jury could
16  conclude she had authority or responsibility to protect the stolen property. [Doc. No. 11-
17  23, at p. 5.] That court explained:

18          Substantial evidence existed from which a reasonable jury could
19          conclude that Jacqueline had constructive possession over the money stolen
        from the safe and dresser drawers. Namely, Jacqueline, an adult, lived at the
20          home with her parents and had a key to the home. Jacqueline knew about the
        floor safe, its combination and how the safe opened, but did not know the
21          combination by memory as she had never opened it before. Elva also told
        Jacqueline that she kept envelopes of money in dresser drawers. Jacqueline
22          told Bigsby that she could open the safe, but her mind "went blank" when
        Bigsby asked her for a "guarantee." This evidence, combined with the fact that
23          Bigsby held Jacqueline at gunpoint, showed that Jacqueline was in
        constructive possession of the stolen property. *Id.* at 5-6.
24
25
26          An independent review of the record confirms the decision by the California Court
27  of Appeal. Jacqueline and Marco enjoyed a special relationship as father and daughter
28  similar to that found in *Weddles*. While the testimony alone concerning the quality of their

relationship might be sufficient to establish constructive possession, here Jacqueline also lived in the house where the property was kept, and knew of safe's location and combination. Given the evidence presented at trial, a reasonable jury could conclude Jacqueline Ibanez had construction possession of the stolen property. Consequently, the conclusion by the California Court of Appeal is not contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.

## 2. Constructive Possession by Eva Gomez

The California Court of Appeal additionally concluded that Eva Gomez had the requisite "special relationship" with Marco and Elva Ibanez such that a reasonable jury could conclude she had authority or responsibility to protect the stolen property. [Doc. No. 11-23, at p. 6.] The court explained:

> Substantial evidence also existed from which a reasonable jury could conclude that based on her special relationship with Marco and Elva, Eva had constructive possession of the stolen property because she similarly "had authority…to protect the stolen property on behalf of the owner." Eva was the best friend of Jacqueline and had lived with the Ibanez family for about one year to attend school. At the time of the robbery, Eva was an adult and Elva considered her to be a family member. Although there was no direct evidence presented that Eva had a key to the residence, the jury could reasonable infer that she did based on the above evidence. Similarly, there was no direct evidence that Eva knew about the safe or the money hidden in the drawers but the jury could reasonably infer that she had such knowledge because she was present when the police investigated the burglary that occurred the day before the robbery where the burglar attempted to open the safe and stole an envelope of money that Elva kept inside a drawer. [Doc. No. 11-23, at p. 6] (Internal citation omitted).

From these facts, the Court of Appeal concluded that a reasonable jury could have found that Eva had constructive possession of the stolen property. An independent review of the records confirms the California Court of Appeal's decision. Further, Eva's relationship with Marcos and Elva Ibanez is distinguishable from that of the individuals in *People v. Ugalino*, 174 Cal. App. 4th 1060 (2009), where the court found an absence of the requisite special relationship. There, two individuals had been living together for three

1  to four months however no other special relationship existed between the parties. *Id.* at

2  1065. The California Court of Appeal found a simple roommate status insufficient to give

3  rise to an authority or duty to protect the stolen property in question. *Id.* Here, Eva Gomez

4  was considered a member of the Ibanez family. [Doc. No. 11-2, at p. 154.] Over the course

5  of the year she lived in the residences, Marcos and Elva had developed a close familial

6  relationship with Eva. *Id.* Additionally, Eva utilized the vehicles of Marcos Ibanez for

7  transportation. *Id.* at 147. Most notably, although the home had four bedrooms, Eva stayed

8  in the same bedroom as Jacqueline Ibanez. 11-1, at p. 146. Jacqueline and Eva cohabitating

9  in the same bedroom weighs heavily against considering Eva's status as that of an

10  independent roommate. This is especially true given that the two other bedrooms were

11  empty. *Id.* If Eva were simply a roommate of the Ibanez family, she likely would have

12  occupied her own space separate from the rest of the family.

13      Additionally, the room Eva and Jacqueline occupied was located directly across the

14  hall from Marcos and Elva. *Id.* From these facts a reasonable jury could conclude that Eva

15  had a close special relationship with Marcos Ibanez and therefore had authority or

16  responsibility to protect the stolen property. The fact that no direct evidence was introduced

17  regarding Eva's knowledge of the safe's location is insufficient to undermine the evidence

18  of her close relationship to Marcos and Elva Ibanez. Consequently, the conclusion by the

19  California Court of Appeal is not contrary to, nor an unreasonable application of, clearly

20  established Supreme Court precedent. It is therefore **RECOMMENDED** that the District

21  Court **DENY** the petitioner's Ground One for relief.

22              **VI.  GROUND TWO: PETITIONER'S LINE-UP**

23      Petitioner's second ground for relief is a claim that the trial court improperly

24  admitted evidence of an unduly suggestive lineup and allowed an in-court identification to

25  occur. [Doc. No. 1, at pp. 14-15.] Petitioner first asserts that the lineup was improper

26  because the other members selected had lighter skin color than his own and because "there

27  is no substantial evidence to support any finding that petitioner was actualy [sic] faking his

28  voice [during the lineup]." [Doc. No. 12, at p. 8.] Respondents assert that there was little

1   physical variance between the six men in the lineup, three out of four victims failed to
2   identify petitioner during the lineup, and petitioner's unusual voice[1] was attributed to his
3   conduct during the lineup and not to the procedures utilized. [Doc. No. 10-1, at p. 45.] In
4   reaching their decision, the California Court of Appeal concluded that petitioner's
5   unsupported assertions were "insufficient to establish that the line-up was unduly
6   suggestive or that the identification was not otherwise reliable under the totality of the
7   circumstances." [Doc. No. 11-30, at pp. 1-2.]

8       Evaluating whether an identification has been irreparably tainted by a suggestive
9   procedure requires a two-part analysis. *See United States v. Love*, 746 F.2d 477, 478 (9th
10  Cir. 1984). First, the Court must determine whether the challenged procedure was
11  impermissibly suggestive. *See Neil v. Biggers*, 409 U.S. 188, 199 (1972). Second, if the
12  process was suggestive, the court must examine the totality of the circumstances to
13  determine whether the witness's identification was nonetheless reliable. *Manson v.*
14  *Brathwaite*, 432 U.S. 98, 114 (1977). The factors to be considered in assessing reliability
15  are: (1) the opportunity of the witness to view the accused at the time of the crime, (2) the
16  degree of attention of the witness, (3) the accuracy of the witness's description, (4) the
17  witness's level of certainty at the confrontation, and (5) the length of time between the
18  crime and the confrontation. Manson, 432 U.S. at 114 (citing *Biggers*, 409 U.S. at 199-
19  200).

20      The fact that an individual may have appeared different from others in a line-up does
21  not alone establish that the line-up was impermissibly suggestive. In *Coleman v. Alabama*,
22  399 U.S. 1, 6 (1970), that petitioner asserted that the line-up procedure and subsequent in-
23  court identification were impermissibly suggestive because he was the only individual
24  wearing a hat. The Supreme Court found that the procedure was not improperly suggestive

25
26

27  [1]     During the robbery both perpetrators made multiple statements to the victims. [Doc. No. 11-2. at
28  pp. 55; 63-64; 66; 69; 73-74.] At the lineup, the officer directed each of the six men to repeat three
    difference sentences said by the "tall suspect" during the robbery. [Doc. No. 11-14, at pp. 59-64.]

1    for two reasons. *Id.* First, the petitioner had voluntarily worn the hat and refused to remove

2    it when prompted. *Id.* Second, the witness had not relied on the hat when making the

3    identification. *Id.* Thus, the Court found that the witness's identification was not induced

4    by the procedures of the line-up which made it impermissibly suggestive. *Id.*

5        Here, the procedures utilized by the police during the lineup were not impermissibly

6    suggestive. While petitioner claims that the identification procedures where improperly

7    suggestive because of the height, color, and voice of the other men selected for the lineup

8    were impermissibly different form his height, color, and voice [Doc. No. 12, at p. 8], there

9    is nothing in the record to support his claim. Any difference in skin color and height were

10   *de minimis* and certainly do not rise to the level of a constitutional violation. *See* [Doc. No.

11   11-33, at pp. 1-6] (Photographs showing the six men in the lineup); [Doc. No. 11-33 at p.

12   72] (Showing the respective heights of the men at 6'2"; 6'4"; 5'10"; **6'3" [petitioner]**;

13   6'3"; and, 6'4").

14       Petitioner's claim of impermissible identification of his voice by the victim is also

15   unfounded. During the identification, Jacqueline noted that petitioner appeared to be

16   "faking his voice" when required to state the three different lines. [Doc. No. 11-29, at p.

17   75.] A video of the entire lineup, including the audio, was shown to the jury during the

18   trial. [Doc. No. 11-2, at pp. 8-13.] Petitioner took the stand and testified in his own defense.

19   [Doc. No. 11-8, at pp. 75-226.] During his testimony, at the prosecutor's request, he stated

20   loudly the same three lines each of the six men spoke during the lineup. The jury had ample

21   opportunity to compare the voice utilized by petitioner at the lineup against the one he used

22   at trial during his testimony. While this Court is not able to pierce the jury's deliberation

23   to determine how they viewed evidence, there are only two possible inferences that may

24   be fairly drawn from this evidence, either: (1) Jacqueline's assertion that petitioner was

25   manipulating his voice to avoid detection is confirmed; or (2) petitioner's in court

26   testimony and the voice used during the lineup are identical thereby discrediting

27   ///

28   ///

1   Jacqueline's identification. However, *no* inference can be drawn from the voice
2   identification that the procedures utilized were unduly suggestive thereby causing a risk of
3   misidentification.[2]

4        Petitioner further argues that the in-court identification of petitioner was also
5   improper because the procedures at the preliminary hearing were impermissibly suggestive
6   and therefore tainted the later identification in front of the jury. [Doc. No. 12, at pp. 8-9];
7   *See* [Doc. No. 1, at pp. 245-246.] Petitioner's argument fails to acknowledge that
8   Jacqueline made a proper identification at the out-of-court lineup before the preliminary
9   hearing. Accordingly, the "taint" alleged by petitioner was negated by Jacqueline's prior
10  identification at the constitutional out-of-court lineup. Additionally, petitioner's entire
11  cross examination of Jacqueline focused on her inability to observe the second "tall
12  suspect" during the robbery. *See* [Doc. No. 11-2, at pp. 97-107.] An in-court identification
13  may be unduly suggestive if it creates a very substantial likelihood of irreparable
14  misidentification. *Neal v. Biggers*, 409 U.S. 188, 198 (citing *Simmons v. United States*, 390
15  U.S. 377, 384 (1968)). Here, petitioner failed to present any evidence that Jaqueline's short
16  in-court identification presented any likelihood of "irreparable misidentification" as the
17  victim had already identified petitioner during a prior proper lineup. Furthermore, defense
18  counsel presented extensive cross examination regarding Jacqueline's inability to observe
19  the petitioner during the robbery. Petitioner has not presented evidence suggesting any
20  likelihood of irreparable misidentification. Consequently, the California Court of Appeal's
21  decision was not contrary to or an unreasonable application of established Supreme Court
22  precedent. Therefore, the Court **RECOMMENDS** that the District Court **DENY** the
23  petitioner's Ground Two for relief.

24  ///

25

26

---

27  [2]    The Court notes that petitioner implicitly relied on the validity of the very same lineup he now
28  attacks to argue that three out of the four witnesses failed to identify him at the lineup. [Doc. No. 11-12, at pp. 142-145.]

# VII. <u>GROUND THREE: INEFFECTIVE ASSISTANCE OF COUNSEL</u>

The petitioner raises two general claims of ineffective assistance of counsel ("IAC") in his instant petition: (1) failure to properly prepare for trial; and, (2) strategic errors during the course of trial.

The standard of review for a claim of IAC is well established under *Strickland v. Washington*, 466 U.S. 668 (1984), and "[s]urmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). To prevail, a defendant must show two things: first, that counsel's performance was so deficient as to fall short of the guarantee of "counsel" under the Sixth Amendment; and second, that counsel's errors were so prejudicial as to deprive the defendant of a fair trial. *Strickland*, 446 U.S. at 687. The *Strickland* standard is "highly deferential" to counsel; the Supreme Court recognized that "[i]t is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." *Id.* at 689. The Court further held that "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.*

The standard of review for a claim of ineffective assistance of counsel raised in a federal habeas petition is even more deferential. Here, the petitioner's claim has already been evaluated and rejected once by the state court. This Court, therefore, is not called upon to determine anew whether trial counsel was ineffective. Rather, the only question before this Court is whether the state court's denial of the petitioner's claim on this basis was "unreasonable." *Harrington v. Richter*, 562 U.S. 86, 101 (2011). A state court's decision is reasonable as long as "fairminded jurists could disagree" on the correctness of the decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004).

As the Supreme Court explained in *Harrington*, a federal court's review of a state court's denial of an ineffective assistance claim receives double deference: "The standards created by *Strickland* and § 2254(d) are both 'highly deferential,' and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105, citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009). "Federal habeas courts must guard against the

danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable, but rather whether there is any reasonable argument that counsel satisfied *Strickland's* deferential standard." *Id.*

Petitioner's claim of IAC in the instant writ constitutes approximately a page of vague argument without indication as to the specific acts or omissions that warrant relief. [Doc. No. 1, at pp. 16-17.] Petitioner clarifies his IAC claims in his Traverse, asserting that his trial counsel failed to investigate an alibi witness, failed to consult experts regarding the DNA, and failed to introduce a medical expert regarding petitioner's injuries. [Doc. No. 12, at pp. 5-7.] In denying petitioners writ for habeas corpus, the California Court of Appeal determined that, "Bigsby provides nothing more than speculation that if his counsel had retained certain experts and investigated potential evidence, such evidence may have bolstered his defense at trial." [Doc. No. 11-30, at p. 2.]

An independent review of the entire record confirms the California Court of Appeal's conclusion. For example, petitioner asserts that his trial counsel should have investigated his alibi witness. Contrary to petitioners assertions, both Octavio Felix and Ismael Escobar were interviewed by defense investigators on more than one occasion. [Doc. No. 11-8, at p. 35]; *Id.* at 52. Additionally, the very section of the record cited by petitioner undermines his own position. [Doc. No. 11-8, at pp. 67-72.] This section demonstrates that petitioner's counsel was able to present an alibi defense witness without giving the prosecution notice or time to investigate and rebut the evidence. *See* [Doc. No. 11-8, at pp. 68-69] (Noting that the prosecution was not notified that Mr. Escobar would testify as a defense witness until the day before trial and there was no indication that he would be providing alibi testimony for petitioner until he was on the stand in front of the jury.) Petitioner fails to recognize the significant tactical advantage he gained by his counsel's actions and more importantly, he fails to assert how additional investigative steps would have resulted in a different outcome.

///

1    Petitioner's second IAC assertion results from claims that his counsel failed to

2 consult experts regarding the DNA evidence, and failed to introduce a medical expert

3 regarding petitioner's injuries. The California Court of Appeal's rejected petitioner's claim

4 noting that petitioner provided only speculation and self-serving assertions to support his

5 position. [Doc. No. 11-30, at p. 2.] Respondents assert that without an affidavit or

6 declaration from petitioner's trial counsel indicating what he did or did not do prior to trial,

7 the only remaining evidence is petitioner's self-serving speculative assertions. *Id.*

8    Petitioner has failed to present any evidence to demonstrate that his trial counsel

9 failed to consult with a DNA expert or that consulting with an expert would have resulted

10 in a different outcome in his trial. Petitioner asserts that it was error to attack "the

11 accurateness and reliability of the DNA results, instead of the statistical significance."

12 [Doc. No. 12, at p. 6.] This unsubstantiated assertion is the exact type of "second guessing"

13 the Supreme Court cautioned against in *Strickland*. Petitioner has failed to provide any

14 additional evidence that his counsel's advice or conduct concerning the DNA evidence fell

15 below that of a competent attorney. Accordingly, the petitioner has failed to demonstrate

16 that his counsel's representation was ineffective.

17    Finally, petitioner asserts that his counsel was ineffective by failing to call a medical

18 expert to present evidence of his physical limitations. [Doc. No. 12, at pp. 6-7.] In general,

19 an attorney's decision not to call a witness constitutes a matter of trial tactics which this

20 Court should not second-guess. *See United States v. Harden*, 846 F.2d 1229, 1232 (9th Cir.

21 1988); *see also Greiner v. Wells*, 417 F.3d 305, 323 (2d Cir. 2005) ("Courts applying

22 *Strickland* are especially deferential to defense attorneys' decisions concerning which

23 witnesses to put before the jury. The decision not to call a particular witness is typically a

24 question of trial strategy that reviewing courts are ill-suited to second-guess.") (citation,

25 internal quotations and brackets omitted); *Williams v. Carter*, 76 F.3d 199, 200 (8th Cir.

26 1996) ("The decision whether to call witnesses is normally a judgment by counsel which

27 the courts do not second-guess.") (citation omitted); *Murray v. Maggio*, 736 F.2d 279, 282

28 (5th Cir. 1984) (noting that the decision to call or exclude a particular witness is generally

"within the realm of trial strategy"). While petitioner concedes that his medical records were presented to the jury by his counsel, he argues that without an expert the jury could not decipher their meaning. [Doc. No. 12, at p. 6.] Contrary to petitioner's assertions, the plain language of the medical records indicates petitioner's physical limitations. *See e.g.* [Doc. No. 1, at p. 188] (noting a 50% loss of grip strength in his left arm); [Doc. No. 1, at pp. 189] ("Left hand examined...weakness...hand was clumsy or awkward.") Additionally, petitioner's trial counsel presented direct observational evidence by two defense witnesses as to petitioner's physical limitations. [Doc. No. 11-8, at p. 22-23]; *Id.* at 38-42. Assertions that a medical expert would have explained petitioner's physical inability to escape from the scene of the crime are not supported by the record or by an affidavit or declaration of a medical expert. Conclusory allegations not supported by specifics do not warrant relief. *Jones v. Gomez*, 66 F.3d 199, 205 (9th Cir. 1995); James v. Borg, 24 F.3d 20, 26 (9th Cir. 1994); *United States v. Popoola*, 881 F.2d 811, 813 (9th Cir. 1989).

Mindful of AEDPA's doubly deferential standard of review of a state court's denial of IAC claims, this Court finds that the California Court of Appeal acted reasonably when it denied the petitioner's claim of ineffective assistance of trial counsel. The Court **RECOMMENDS** that the District Court **DENY** the petitioner's Ground Three for relief.

## VIII. GROUND FOUR: PROSECUTORIAL MISCONDUCT

In his original federal writ, petitioner raised two claims of prosecutorial misconduct: (1) the prosecutor made misleading statements regarding the DNA[3] and alibi evidence; and, (2) the prosecutor made impermissible inflammatory statements regarding petitioner's credibility. [Doc. No. 12, at pp. 9-11.] The California Court of Appeal's decision rejected petitioner's claim, finding that the prosecutors remarks did not appear to be inflammatory

---

[3] In his Traverse, petitioner concedes that his comments regarding the DNA were not sufficient to rise to the level or harm. [Doc. No. 12, at p. 11] ("Petitioner acknowledges that in itself the error is harmless.") Therefore this Court will not address this issue.

1   or improper and did not rise to the level of prosecutorial misconduct. [Doc. No. 11-30, at

2   p. 2.]

3        In assessing claims of prosecutorial misconduct on habeas review, federal courts

4   must assess whether a prosecutors comments, "so infected the trial with unfairness as to

5   make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S.

6   168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "Th[is]

7   standard allows a federal court to grant relief when the state-court trial was fundamentally

8   unfair but avoids interfering in state-court proceedings when errors fall short of

9   constitutional magnitude." *Drayden v. White*, 232 F.3d 704, 713 (9th Cir.2000).

10       **A. Commenting On Petitioner's Credibility**

11       During closing arguments the prosecutor stated, "However, it's not my opinion that

12  counts, but I submit that the 12 of you who are going to decide this case haven't been fooled

13  by that story…. Come back with a unanimous verdict on all counts and in one clear voice,

14  you will tell them, you didn't fool us. You didn't fool anybody. You are guilty of

15  everything you're charged with." [Doc. No. 11-12, at pp. 199; 201.] Petitioner asserts that

16  these statements impermissibly appealed to the passion of the jury. [Doc. No. 12, at p. 11];

17  [Doc. No. 1, at pp. 17-18.]

18       "In closing arguments, both defense attorneys and prosecution attorneys are allowed

19  reasonably wide latitude. They may strike 'hard blows' based upon the testimony and its

20  inferences. . . ." *United States v. Gorostiza*, 468 F.2d 915, 916 (9th Cir.1972). Prosecutors

21  are entitled to argue that the opposing witnesses are not telling the truth. *See United States*

22  *v. Sarno*, 73 F.3d 1470, 1496 (9th Cir.1995). In cases where the jury is presented with two

23  conflicting versions of events it is reasonable to infer and argue that one of the two sides is

24  lying. *United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir.1991)

25       Here, the jury was presented with two conflicting versions of events. Kody Carstens

26  and co-defendant Oscar Ortega testified that petitioner was the second gunmen in the house

27  during the in-home robbery of the Ibanez family. Petitioner and Ismael Escobar testified

28  that at the very same time of the robbery, they were at Mr. Escobar's home. There is no

1  way to reconcile these versions of events unless one version is in fact a lie. Nothing in the

2  arguments of the prosecutor or in the language chosen to attack petitioner's credibility

3  amounted to "inflaming the passions of the jury." *See United States v. Marrale*, 695 F.2d

4  658, 667 (2d Cir. 1982) (where a prosecutor's repeated warning that the jury not be "fooled"

5  by the defense tactics did not deprive defendant of a fair trial, "since one who is fooled is

6  not thereby necessarily a fool, and one who fools another does not necessarily exhibit a

7  moral defect."). Even assuming that the prosecutor impermissibly commented on

8  petitioner's credibility or vouched for the evidence, the comments were so fleeting and

9  isolated in nature that any assumed violation would not rise to the magnitude of a

10  constitutional violation. Petitioner is therefore not entitled to habeas relief under this

11  theory.

12  **B. Prosecutor's Misstatement of Fact During Closing Arguments**

13  During closing arguments the prosecutor stated:

14  [Petitioner] can't even get his boys to get their story straight. Ismael
   comes in and tells you, "oh yeah, he rode his bike to my house. He showed up
15  riding his bike at 7:30 in the morning. I was just hanging out, even though we
   were drinking until 4:00 A.M., and all of a sudden he like just needed a ride,
16  and I didn't ask any questions because I was helping my boy. I didn't see
17  anybody down there, but I gave him a ride down to south bay, drove him back
   to his house" What's his credibility? Does he have a motive to help his boy
18  and get Jelani off? [Doc. No. 11-12, at pp. 98-99.]
19

20  Contrary to the prosecutor's comments, petitioner and Mr. Ismael Escobar

21  consistently testified that on the morning of the burglary, petitioner walked over to Mr.

22  Escobar's house because he left his bike there the prior evening. [Doc. No. 11-8, at p. 42]

23  (Testimony of Mr. Escobar concerning the bike); [Doc. No. 87; 96.] In an attempt to

24  impeach petitioner during the cross examination, the prosecutor questioned petitioner

25  about why he originally told Detective Wolf he rode his bike over to Mr. Escobar's house

26  on the morning of September 5, 2010. [Doc. No. 11-8, at p. 195.] Petitioner did not

27  remember saying that to the detective. *Id.* Correcting his error after the cross examination,

28  the prosecutor stipulated that there was no evidence petitioner told Detective Wolf that he

1  rode his bike over to Mr. Escobar's on the morning of the burglary. [Doc. No. 11-8, at p.
2  215.]

3          Petitioner asserts that the statement in the prosecutor's closing argument regarding
4  whether he rode his bike or walked over to pick his bike up from Mr. Escobar's house was
5  prejudicial because it falsely attacked the main alibi defense. [Doc. No. 12, at p. 11.] After
6  reviewing the record, the Court finds that the assertion by the prosecutor was not supported
7  by the evidence and was therefore made in error. However, to prevail under federal habeas
8  corpus review, petitioner must also demonstrate prejudice in the misconduct that renders
9  the trial fundamentally unfair. *Wood v. Ryan*, 693 F.3d 1104, 1116 (9th Cir. 2012). Here,
10 the comment by the prosecutor, when read in context, was an attack on the overall story
11 and credibility of Mr. Escobar and petitioner, and not limited to whether he rode his  bike
12 or walked over. Additionally, any error inserted by the prosecutor's attempt to impeach
13 petitioner during cross examination with statements he never made to Detective Wolf was
14 immediately cured by the above-referenced stipulation of counsel.

15         Petitioner has failed to show that prosecutor's comments during closing arguments
16 rendered his trial fundamentally unfair. The statement in closing argument was fleeting and
17 isolated. Given the overwhelming evidence against petitioner, it is improbable it would
18 have impacted the jury's decision. *See id.* ("The defendant must show that there is a
19 reasonable probability that, but for counsel's unprofessional errors, the result of the
20 proceeding would have been different.")

21         Finally, petitioner argues that it was ineffective for his trial counsel to fail to object
22 to the misstatement made by the prosecutor during closing argument. However, many
23 lawyers refrain from objecting during opening statements and closing arguments for a
24 variety of reasons. Refraining from objecting, or failing to object, is therefore within the
25 "wide range" or permissible professional legal conduct when the misstatements are not
26 egregious. *United States v. Necoechea*, 986 F.2d 1273, 1281 (9th Cir. 1993). Here, the
27 failure of defense counsel to immediately object to the erroneous comment by the
28 prosecutor during a lengthy oral summation, does not rise to the level of ineffective

1    assistance of counsel. This is especially true in light of the acknowledgment and stipulation

2    by the prosecutor that he was wrong in asserting that the petitioner told Detective Wolf a

3    different version of events [Doc. No. 11-8, at p. 215], and the trial judge's *repeated*

4    admonishment that the questions, comments, and arguments of counsel were not evidence.

5    *See e.g.* [Doc. No. 11-12, at p. 39] ("And I'll remind the jury that what the lawyers say is

6    not evidence, and all the comments throughout the trial are not evidence, only the

7    witnesses' answers are."); [Doc. No. 11-7, at pp. 202-203] ("There's no need to strike a

8    question because a questions is not evidence even when the attorney's trying to testify....

9    You're to ignore the question because questions are not answers or are not testimony.");

10   [Doc. No. 11-7, at p. 97] ("A stipulation is the exception to the rule [that] when the

11   attorneys are talking that is not evidence."); [Doc. No. 11-1 at, p. 66] ("Please keep in mind

12   that nothing that is said by the attorneys in this trial is evidence."); [Doc. No. 11-12, at p.

13   83] ("Please keep in mind that you have heard all of the evidence in this case. What the

14   attorneys tell you now is not evidence, but they will be recalling the evidence in the case,

15   and if your recollection is different from...any of the attorneys in this case, it's your

16   recollection that really counts....")

17        Petitioner has failed to show that, had his attorney objected, the outcome of the trial

18   would have been different. *Strickland v. Washington*, 466 U.S. 668, 694, (1984). Therefore,

19   this Court finds that the California Court of Appeal's denial of petitioner's claim for

20   prosecutorial misconduct did not result in a decision that was contrary to, or involved an

21   unreasonable application of, clearly established Federal law, as determined by the Supreme

22   Court of the United States, or resulted in a decision that was based on an unreasonable

23   determination of the facts in light of the evidence presented in the State court proceeding.

24   The Court therefore **RECOMMENDS** that the District Court **DENY** petitioner's Ground

25   Four for relief.

26                        **IX. <u>CONCLUSION</u>**

27        The Court submits this Report and Recommendation to United States District Judge

28   Roger T. Benitez under 28 U.S.C. § 636(b)(1), Local Civil Rule 72.1(d) and HC.2 of the

15-cv-1452 BEN (KSC)

United States District Court for the Southern District of California.   For the reasons outlined above, **IT IS HEREBY RECOMMENDED** that the Court issue an Order: (1) approving and adopting this Report and Recommendation; and, (2) directing that Judgment be entered denying the Petition for Writ of Habeas Corpus.

**IT IS HEREBY ORDERED THAT** any party may file written objections with the District court and serve a copy on all parties **_no later than May 2, 2016._** The document should be entitled "Objections to Report and Recommendation."

**IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the Court and served on all parties no later than **_May 16, 2016_**.

The parties are advised that failure to file objections within the specified time may waive the right to raise those objections on appeal of the Court's Order. *See Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153, 1156 (9th Cir. 1991).

**IT IS SO ORDERED.**

Date: _____, 2016

KAREN S. CRAWFORD
United States Magistrate Judge